### RICKARD et al. v. DU BON.

(Circuit Court of Appeals, Second Circuit. July 25, 1900.)

#### No. 165.

PATENTS—UTILITY—SPOTTING TOBACCO LEAVES.
    The Rickard patent, No. 604,338. for an improvement in the art of treating tobacco leaves, which consists in sprinkling the leaves of the growing plant with chemicals—preferably, a solution of potash, but including any alkali—which produce spots, and are claimed to improve the quality of the leaves for use as cigar wrappers, is void, because not useful; the only effect of the treatment, if not the only object, being to spot the tobacco, and counterfeit the leaf spotted by natural causes.

Appeal from the Circuit Court of the United States for the District of Connecticut.

F. T. Chambers, for appellants.
W. E. Simonds, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. This is an action for the infringement of letters patent No. 604,338, granted May 17, 1898, to the complainants, for "improvement in the art of treating tobacco leaves." The invention "relates to the art of treating tobacco leaves which are employed as wrappers for cigars," and purports to have for its object "a process for treating the leaves of a growing plant in such a manner and by such means as to provide for producing a wrapper of superior quality." The treatment described in the specification consists in applying to the leaf, while the plant is still growing, preferably by means of atomizers, about the time the leaves have reached their maturity, "chemicals belonging to the alkaline group, such as potash, and at the same time such chemicals as have a considerable affinity for water, so that the leaf will only be partially deadened at the spots of application, whereby sufficient vitality will be left in such spots to allow for absorption and assimilation of the chemical throughout the leaf, and to prevent the spots from becoming brittle." The specification states that "the best mixture found available for the purpose is a combination of potash and glycerin,—the potash having the important property of promoting or increasing the burning quality of the leaf, while the glycerin maintains the spot soft and pliable, so as to maintain the usefulness of the leaf as a wrapper,"—and recommends solutions of caustic potash, known commercially as "Babbitt's Caustic Lye," varying from 16 ounces to 32 ounces per gallon of water,

with or without the addition of glycerin in the proportion of about 1 pint of glycerin to 10 gallons of the solution. It also contains this statement:

"Other agents may be such chemicals as absolute alcohol, with or without glycerin, lime, or the like; but it will, of course, be understood that any means may be employed for securing the two results emphasized, namely, the increasing of the burning quality of the leaf, and causing the spots to remain soft and pliable."

The claims are:

"(1) An improvement in the art of treating tobacco leaves, which consists in applying a combustion-promoting agent to the leaves of a growing plant, substantially as described.

"(2) An improvement in the art of treating tobacco leaves, which consists in applying an alkali to the leaves of a growing plant in spots, substantially as described.

"(3) An improvement in the art of treating tobacco leaves, which consists in applying a mixture of potash and glycerin to the leaves of a growing plant in spots, substantially as described."

The defendant treated a crop of tobacco by spraying the leaves, when they were about ripe and ready for cutting, with a solution of about one pound of caustic soda (commercially known as "Banner Lye") to a gallon of water, with a small admixture of molasses, sugar, and glycerin.

The court below was of the opinion that the patent was void for want of utility, "except to deceive," unless it could be sustained as one for a process of treatment by ingredients which would promote the burning quality of the leaf; and, without deciding that it was not void for want of utility, held that the treatment by the defendant was not an infringement of the claims, as neither caustic soda, nor any other ingredient of the mixture, was a combustion promoting agent. The court accordingly dismissed the bill. 97 Fed. 96.

We are of the opinion that neither the treatment applied by the defendant, nor that described or advised in the patent, has any tendency to promote the burning quality of the leaf, or to improve its quality in any respect, and that the only effect, if not the only object, of such treatment, is to spot the tobacco, and counterfeit the leaf spotted by natural causes.

The notion has long prevailed with a numerous class of smokers that cigars having spotted wrappers are superior to those without them. This notion is a pure delusion. It originated and has been propagated by the coincidence that much choice tobacco is spotted, being raised in localities where this characteristic is imparted by natural causes, although without improving or impairing the quality of the leaf. The origin of the spots has been referred to various causes by different authorities; the most rational explanation being that in some localities they are produced by the stings of insects, and in others by the action of the dew. So extensively has this erroneous notion obtained in this country and in Europe among consumers, that for many years spotted wrappers have commanded a considerably higher market price than unspotted; and dealers in tobacco, to meet the demand and obtain the higher price, have been accustomed to spot their leaves artificially, by spraying them with acids or chemical mor-

dants. As is stated in Tobacco Trade Review, in an article published in 1885:

"Of course, it was impossible to supply the demand for cigars having this natural characteristic; but, fortunately for manufacturers, science stepped in, and a common vinegar cruet, filled with muriatic acid, secured the desired result."

Until shortly before the patent in suit was applied for, cigar manufacturers and dealers in tobacco seem to have monopolized the counterfeiting of spotted tobacco; but in course of time the tobacco growers, seeking to share the illicit profit, began to spot their crops. So far as appears, they had not done so extensively before the date of the application for the patent in suit; but prior to that date Connecticut growers were sprinkling their crops, before the tobacco was cured, with solutions of acids. The patentees began their experiments in Ohio in 1893. They commenced by spotting leaves that had been cut and cured, treating some with a solution of peroxide of hydrogen, and others with a solution of carbonate of ammonia. In 1894 they spotted a few growing plants, first using a lye, and then Babbitt's potash. They observed, so Mr. Rickard testifies, that "after four or five hours the plant would seem to recover from its wilted condition, and apparently had absorbed or assimilated the material thoroughly within that time." In the summer of 1895 they applied their process upon a commercial scale, spotting growing crops for others. In October, 1895, they made their application for the patent in suit.

In their original application they made these statements:

"This invention relates to the art of treating tobacco leaves which are employed as wrappers for cigars, and it has for its object to provide a process for discoloring the leaves in spots, so that the same will accurately and truly simulate the well-known Sumatra wrapper or tobacco leaves. * * * The quality of a Sumatra tobacco leaf is commonly believed to be somewhat superior to the American leaf, and this fact, taken together with the duty levied thereon, gives the same a high marketable value. * * * This invention therefore contemplates providing means for discoloring a tobacco leaf in spots so that its identity cannot be distinguished from the ordinary Sumatra leaf, and, to accomplish this result, is designed to employ such chemical or other means as will partially deaden the life of the leaf in isolated spots, so that such spots will become discolored and partially or completely bleached, while at the same time remaining sufficiently soft and pliable so as not to destroy the usefulness of the leaf as a wrapper for cigars. * * * It has already been observed that the chemical or other agent is generally applied to the leaf while the plant is growing, so that, after such agent has produced a partial decomposition of the leaf at the point of application, the sun and rain will bleach out the spots, while the life still remaining in the leaf will maintain the partially decomposed spots soft and pliable. * * * In this connection an incidental feature of the invention is that since the discoloring agent is applied to the leaf while the plant is growing, and since the discolored leaf is only partially deadened, the chemicals will be absorbed and assimilated throughout the leaf. This becomes very important when the chemical employed is such a chemical as potash, that would greatly increase the burning quality of the leaf when used as a wrapper; and it has been found that the chemical is more thoroughly distributed throughout the body of the leaf by applying the same to the leaf in spots, and allowing the growing leaf to absorb and assimilate the chemical."

The patent office rejected the application upon the ground that the described treatment was not useful, and the only object of the alleged invention was the deception of the public. Thereafter the applicants amended their application by striking out the parts indicative of their

purpose to simulate the naturally spotted leaf, and inserting statements emphasizing the utility of their treatment in improving the quality of the leaf. The board of examiners again rejected the application, stating as their opinion that "it is clear that the process has no substantial purpose, and can have no result, other than the fraudulent imitation of a known product for the purpose of deceiving the public." The applicants then appealed to the commissioner of patents, and before him fortified their application by the affidavits of two cigar manufacturers, and the unverified communication of another, stating in substance that the leaves treated by the process were thereby improved in quality. The commissioner of patents, influenced by this evidence to believe that the process was useful for some purpose, overruled the decision of the board of examiners, and granted the application.

Although the patent, in its description and claims, covers broadly the application of the chemicals at any stage of the growth of the plant, it is to be observed that the patentees insist that it is useful and efficient if applied after the plant has matured. Mr. Rickard testifies to an instance where a crop of tobacco was cut within five hours— some of it within four—of the time of the application, and found to be in a very satisfactory condition. The proposition that the burning quality of tobacco can be improved by sprinkling the leaf with a solution of lye or potash sufficiently strong to discolor and partly eat out the leaf where it is touched by the drops, and that the leaf will advantageously absorb and assimilate such chemicals, even when applied within a few hours of the time of cutting, is one which staggers credulity. This is so repugnant to common sense and ordinary intelligence that it can hardly be accepted as true without adequate corroborative proof. We have carefully examined the record before us, to ascertain whether such proof is supplied. A number of cigar manufacturers, tobacco dealers, and tobacco growers have testified for the complainants to the general effect that tobacco spotted by the patented process is of improved quality; but an analysis of their testimony shows their opinions to be of little value, beyond establishing the fact that the spotted tobacco brings a higher market price than the unspotted. The quality of tobacco differs with different soils, with different seasons, with different conditions of growth, cutting, and curing; and the testimony fails to demonstrate that under identical conditions the leaves spotted by the process of the patent are of better quality in any respect than unspotted leaves. Their opinions are no more persuasive than those of the large body of smokers who have been so long convinced that spuriously spotted tobacco is superior to the unspotted, and whose fallacious judgment has created the demand supplied by the spurious article. A recapitulation of the testimony, or of the opposing testimony, would not be profitable. It suffices to say that the proofs fail to overcome the presumptions created by the conduct and avowals of the patentees.

It is plain that the patent originated in experiments which were intended only for the purpose of counterfeiting the spotted tobacco of commerce. The first experiments of the patentees, made upon cured tobacco, and with chemicals useful only for their corrosive or bleaching action, prove this. It may be that their lye and potash experi-

ments were suggested, as Mr. Rickard testifies, by his belief that the spots on Sumatra tobacco were caused by the ashes blown by the wind upon the plants. It may be that they conjectured that potash, when sprinkled upon the growing leaves, would be absorbed and assimilated by the plant, and would improve the burning quality. But the result they had in view was not to improve, it was to simulate. When they introduced their treatment commercially, in the summer of 1895, they had sprinkled only a few leaves, and must have known, unless their judgment was overmastered by their cupidity, that their experiments were, as to this theory, of no probative value. Their dominant object being to make a profit by enabling others to commit a fraud, it is not unlikely that they proposed to appeal to some tobacco growers by an argument having a color of honest merit; and this may explain the incidental suggestion in their original application for the patent, that the potash treatment would improve the burning quality of the leaf. That they placed no reliance upon this theory when they made that application is indicated by the indirect and inferential terms in which it was advanced. If they had been convinced that their treatment was an improvement in the art, by which the quality of tobacco was improved, they would have said so plainly and prominently in the application, and made this the meritorious basis for at least one of their claims. Instead of doing so, they avowed the object and stated the advantage of their invention to be the simulation of spotted tobacco. The application was carefully drawn to enable them to secure the monopoly of spotting tobacco, either while growing, or at any other stage, by the application of any chemical which would serve as a "discoloring agent." They asked for claims covering "an improvement in the art of treating tobacco leaves, which consists in partially deadening and discoloring the leaf in spots," and "an improvement in the art of treating tobacco leaves, which consists in discoloring the leaves of a growing plant in spots," and also "an improvement in the art of treating tobacco leaves, which consists in applying a mixture of potash and glycerin to the leaf in spots"; but, among their seven claims, they asked for none restricted to the application of potash, or of potash and glycerin, to the leaf of the growing plant. When they found that they could not succeed upon such a presentation, they made a complete change of front, suppressed their original representations, put forward elaborately the theory of improving the quality of the tobacco by their treatment, limited the claims sought to the application of combustion-promoting agents to the leaves of growing plants, and bolstered up their case before the commissioner by ex parte statements of witnesses. It is noticeable that, of these witnesses, only one has been produced by the complainants, and his testimony is worthless. They are now insisting that the patent is infringed by applying their process not only after the plant has practically matured, when it is manifest that the alkali or potash could not be absorbed or assimilated appreciably, but that it is infringed by applying a solution which, according to the weight of testimony, has no effect upon the burning quality of the leaf.

The patent shows upon its face that it is intended to secure a monopoly in the art of spotting growing tobacco, without reference to improving its quality. The only fact that lends color to the theory

that the treatment of the leaves by the patented process will improve the quality is that tobacco rich in organic salts of potash absorbed from the soil has a porous carbon, and is therefore of superior burning quality. But tobacco in which lime replaces the potash has to that extent a compact carbon, and will extinguish rapidly. According to the specification, lime can be substituted for potash in applying the process of the patent. And the claims of the patent cover a treatment by any alkali.

In authorizing patents to the authors of new and useful discoveries and inventions, congress did not intend to extend protection to those which confer no other benefit upon the public than the opportunity of profiting by deception and fraud. To warrant a patent, the invention must be useful; that is, capable of some beneficial use as distinguished from a pernicious use.

The decree of the court below is affirmed, with costs.