### MAHLER et al. v. ANIMARIUM CO.

(Circuit Court of Appeals, Eighth Circuit.   October 21, 1901.)

#### No. 1,527.

PATENTS—VALIDITY—THE OXYDONOR.

> The Sanche patent, No. 587,237, for a device known as the "Oxydonor," an appliance for use in treatment for disease, is void on its face for lack of patentable invention. The device itself, which consists of two metal plates or pads connected by a fine wire, has no features of novelty which render it patentable, considered apart from the force, if any, which is thereby utilized; and the theory advanced by the patentee in the specification to sustain the claim of utility in some respects, at least, contradicts accepted truths of medical science, and appears to rest upon no substantial foundation, but to have been put forward for the sole purpose of obtaining a patent on a device to be sold to the public for the treatment of disease. It also seems probable that, if the device has any utility, it is due to the generation of a slight current of electricity between the two plates, and that the denial of such effect in the specification was made for the same purpose, since as an electrical appliance it clearly lacks novelty.

Appeal from the Circuit Court of the United States for the Southern District of Iowa.

L. A. Gilmore, for appellants.

C. A. Dudley and Justus Chancellor (Charles S. Thornton, on the brief), for appellee.

Before SANBORN and THAYER, Circuit Judges, and ADAMS, District Judge.

THAYER, Circuit Judge. The Animarium Company, the appellee, exhibited its bill against James H. Mahler, Myrtle G. Mahler, and Chattie E. Field, who were doing business as the Oxygenor Company, the appellants, to restrain the latter from infringing United States letters patent No. 587,237, issued July 27, 1897, and United States letters patent No. 587,612, issued August 3, 1897, and United States letters patent No. 588,483, issued August 17, 1897. The patents in question were issued to Hercules Sanche, as assignor to the Animarium Company of New York. The defendants below, who are the appellants here, demurred to the bill, but the demurrer was overruled. Thereupon they elected to stand on the demurrer, and a decree was entered in favor of the Animarium Company, sustaining the validity of patents Nos. 587,237 and 587,612, from which decree the defendants have appealed. Although the bill charges an infringement of the three patents specified above, yet it was conceded in argument by the complainant's solicitors that the right of the Animarium Company to a decree depends upon the validity of patent No. 587,237, issued on July 27, 1897, which contains but a single claim. It was admitted that the decree below ought not to have been granted if that claim is invalid. In view of these concessions made in open court on the oral argument, it becomes unnecessary to examine or express any opinion concerning the later patents. As the case below passed off on demurrer, no testimony having been heard, in determining whether patent No. 587,237 is valid we are at liberty to consider only the allegations of the bill and the specification and claim of that patent. We are at liberty, however, to examine the patent and determine whether it is valid in the light of that common knowledge of facts and principles which is possessed by all persons of average intelligence. Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200; Richards v. Elevator Co., 158 U. S. 299, 15 Sup. Ct. 831, 39 L. Ed. 991; Id., 159 U. S. 477, 16 Sup. Ct. 53, 40 L. Ed. 225; Engraving Co. v. Hoke (C. C.) 30 Fed. 444, 446. The specification of letters patent No. 587,237 declares at the outset that the patentee has invented "a new and improved method of, and apparatus for, treating diseases, of which the following is a specification." He then says:

"In an application for a patent filed by me September 17, 1885, I have advanced certain new ideas and theories concerning the disturbance of the normal functions of life commonly known as 'disease.' My observation and experience justify the belief that most diseases, and especially those of a nervous character, are due to a disturbance of the electrical equilibrium of the body. It is well known that the earth and the surrounding envelop of air are strongly charged with an opposite polarity, and that any disturbance of the normal relations of these forces, such as occurs before a thunderstorm, results in discomfort to the whole animal tribe. The habits of civilized life—i. e. the wearing of shoes and clothing of nonconducting material, and the insulation from the earth by dry floors and feather beds—

prevent the body from partaking freely of the electrical equilibrium of the earth, and a preponderance of an electric tension of either a positive or negative character in the body produces, by a stimulation or suppression of chemico-vital function, the abnormal condition of things, the symptoms of which we call 'disease.' Hogs in the field, turtles, alligators, and the lower animals that lie in the mud and readily partake of or assimilate themselves to the electrical conditions of the earth, are notoriously free from disease and nervousness. Man, the feathered tribe, and higher animals, who are covered with a nonconducting coat, and are more or less insulated from the earth, are subject to these difficulties in marked contrast. Pursuing this theory, I have undertaken to correct these difficulties, not by an attack upon the symptoms, after the manner of medication, but by the logical process of bringing to bear upon the system a set of influences reverse to those which involved the difficulties. In my first application I only contemplated the restoration of electrical equilibrium by a metallic or conductive contact between the body and the earth. My present application comprehends even a wider scope and a more general application, in that it does not simply comprehend a preservation of electrical equilibrium, for this would only seem to preserve health, but it contemplates the removal of abnormal conditions by producing an electrical tension in the body contrary to that which superinduced the disease; and for this purpose I have found that the contact of the body through a small conductor with a source of extraordinary heat or extraordinary cold permits me to produce either a positive or negative condition in the body without connection with the earth; it being remembered at the outstart that the electrical condition referred to by me has nothing whatever to do with galvanism or dynamic currents, but is only a condition of electric potential or static polarity. This agency permits me to reach all the functions of the body, and bring them into healthy and effective action, stimulating the chemico-vital processes without having to rely upon the single channel of an enfeebled and diseased stomach, which is almost the only avenue of treatment by medication."

Then follows a description of the device, which is very simple; being nothing more than two metallic plates connected by a fine wire, one of which plates is to be placed in contact with the limb or arm of a patient, and the other placed in an ice cooler or on a stove or in the sun. The cut on the opposite page illustrates the device. The inventor suggests in his description of the device that the wire connecting the two metal plates may be connected at $M^2$ in the drawing, by an "electrical switch," with a "metal anchor" imbedded in the ground so as to put the patient "in the same electric tension with the earth."

The following additional observations or statements are contained in the specification:

"It is not pretended that there is any flow of current or any of the phenomena of dynamic electricity manifest in this apparatus, but only a charging of the body with a certain magnetic polarity, the effects of which upon the system are remarkable in stimulating the system to throw off disease. The cold or earth connection I find almost universally applicable to allay nervousness and stimulate the system by counteracting one polarity of the body. The hot connection is for the opposite polarity,—such, for instance, as exists in inflammatory fevers; its effect being usually to first raise the temperature, and then bring the body to a normal temperature by dissipating congestion and starting the perspiration. The manner in which I believe the charging of the body with a positive or negative polarity acts upon the system to effect physiological changes is by the exertion of an attractive influence, and the stimulating of an endosmose of gases of the air through the capillaries and electrolytic action in the cells, which agencies by intelligent application are made to arrest various disorders. * * * I am aware that it is well known to apply to patients the cooling effect of direct contact or radiation of hot bricks, bottles of water, etc., and also to apply directly cool-

ing applications of ice. The application of these is entirely different from my invention, in that I do not employ the direct conduction of cold or heat, nor do I apply it in the same way. I utilize the influence of a cold or hot object at a distance through a conductor of electricity, the source of its influence being removed to a point out of range of direct radiation or conduction of heat. Another important and distinguishing feature of my invention is that the wire connection which I employ does not necessarily have the qualities of a conductor for dynamic electricity where flow or passage of the current increases with the increase of cross sectional areas of the conductor, but I find ordinarily that the best effects are produced with a very small copper wire, varying in size from 24 to 30, and when great variations in temperature —i. e. an intense degree of cold or intense degree of heat—are employed the tendency to best effects is produced by the finer wire, and vice versa. This strengthens my belief that the principle which is made available is not of a dynamic character, but only such small wire is required as to permit the polarity in molecules of the wire to induce a corresponding polarity of the body, and to make of the body a feeble magnet of positive or negative polarity, according to the character of the connection (hot or cold) and the nature of the disease. In substantiating by analogy the effect of hot or cold connection upon magnetism in inanimate things, I find by test that a magnet of normal temperature connected at its equator to a body of ice water by a fine wire will after a lapse of several days show a strengthening of its north pole and a weakening of its south pole; the center of magnetism in the south pole moving gradually towards the equator. A magnet similarly connected to a hot body (the heat of a stove) shows precisely the reverse,—i. e. a strengthening of the south pole and a weakening of the north pole,—and I am led to believe that a similar result takes place in the human body when my invention is applied. It is not absolutely essential that I should employ different temperatures to get the concomitant effects of magnetic polarity. A body of hydrogen gas can be substituted for the cold application and oxygen for the hot application, and the body of the patient may also be given a polarity by connection with the pole of a permanent or electro magnet."

The claim of the patent is as follows:

"The clinical instrument comprising a contact plate or member adapted to be attached to the body to be treated, a second plate or member adapted to

be placed in or under the influence of a temperature higher or lower than the body to which the other plate is attached, or under the influence of matter which is electro-positive or electro-negative to the body having said other plate or member attached to it, and a flexible conducting or transmitting medium connecting said two plates or members, said medium being of a relatively small size to said plates or members, and of a length sufficient to permit said two plates or members to be placed at such distances apart that the body having one plate or member attached thereto will be removed beyond the range of influence transmitted by direct radiation, conduction, or contact from said other plate or member, substantially as described."

The appellants contend in this court, as they did in the lower court, that patent No. 587,237 is void on its face, for the reason that the specification pretends to describe in scientific terms the theory upon which the patented device operates, whereas, as they aver, the terms employed are unscientific, ambiguous, and false as statements of scientific truths, and were intended only to mistify the officials of the patent office and to mislead the public. If this charge is true, it doubtless renders the patent void, and its truth or falsity must be determined in the main by a critical analysis of the specification, since the record contains no other evidence to which we can refer. Turning to the specification and translating it as we understand it, it contains in substance the following representations or statements: The inventor of the device believes (such belief being based on his observation) "that most diseases, and especially those of a nervous character, are due to a disturbance of the electrical equilibrium of the body"; that the habits of civilized life, particularly modes of dress, prevent the body from partaking freely, as it ought to partake, of the electrical equilibrium of the earth, in consequence whereof the body becomes charged at times either with too much positive or too much negative electricity, the result being an overstimulation or a suppression of the vital functions, producing an abnormal condition, termed "disease." This is the new fact or principle which the inventor thinks he has discovered and seeks to utilize in the treatment of diseases. Having adopted this theory of the origin of all or most diseases, he represents that he has had in contemplation the removal of the abnormal condition aforesaid, which end he proposes to accomplish by producing an electrical condition of the body contrary to that which occasioned the disease; and the means that he employs to that end, which is the only patentable subject, is a small wire with metallic pads at the end, designed to connect the human body with some other object which is either very hot or very cold, and so far removed as to avoid the effects of radiation. The inventor recommends a hot connection to allay inflammation, and a cold connection to allay nervousness; but he makes no recommendation as to the sort of connection which should be made to cure hundreds of diseases that are well known to the medical profession, leaving those who may be afflicted with such diseases to find out the proper connection for themselves. Concerning the manner in which the alleged alteration of the polarity of a human body by means of the wire connection operates to cure disease, the inventor says that he believes that it operates by "the stimulating of an endosmose of gases of the air through the capillaries and electrolytic action in the

cells, which agencies by intelligent application are made to arrest various disorders." This explanation is not very lucid, but as the word "endosmose" means "a thrusting inward," and as it is a word frequently employed in physiology to describe the absorption of the fluids of the stomach into the blood vessels by capillary attraction, and as "electrolytic action" means the decomposition of substances occasioned by electricity, the paragraph above quoted must be understood to mean that the inventor believes that his device operates to cure disease by causing an increased flow of the gases of the air through the capillaries or ducts of the human body, and by causing a more rapid decomposition in the cells of the body, due to the action of an increased current of electricity. Now, as no one knows in what way electricity when applied to the human body operates to cure disease, or whether it does effect cures, it is obvious that any physician who employs electricity as a healing agent by means of an ordinary battery might give the very same explanation of its operation as that given by the patentee, and with full as much assurance that his explanation was right. A further criticism of the clause of the specification last quoted is that, while the inventor suggests that an "intelligent application" of his device must be made to arrest various disorders, yet he nowhere points out how it should be applied to cure any specific disease which flesh is heir to. If one has a headache, or a cold, or consumption, or a cancer, or Bright's disease, or any severe pain, all of which diseases, according to the inventor's theory, are due to a disturbance of the electrical equilibrium of the body or to a loss of one species of polarity, he could not determine from anything contained in the specification how the device should be applied, or with what exterior object he should become specially connected, to regain a proper electrical equilibrium or the requisite electrical polarity. Again, in two places in the specification the inventor says, in substance, that his invention has naught to do with "galvanism or dynamic currents," and that he does not pretend that there is a flow of any electric current along the wire, from which we understand that he means to assert, without any proof whatever, that the connection of two bodies of a different temperature and of a different polarity by a copper wire does not generate an electric current. There are other statements, however, contained in the specification, such as the statements, in substance, that the wire "makes of the body a feeble magnet of positive or negative polarity," according to the connection; that he utilizes "a conductor of electricity" to communicate the influence of a hot or cold object to the human body; and that the body may be given the desired polarity by connecting it by means of the wire with an electro-magnet,—all of which seem to be inconsistent with the aforesaid assertions of the inventor, and to have been intended to create the impression in the minds of ordinary persons that a current of electricity such as they are familiar with is generated by his device, and that he makes use of it for healing purposes.

We are of the opinion that the patented device, considered by itself, and apart from the force, if any, that is thereby utilized, contains no features of novelty entitling it to a patent; it being nothing

more than a wire connecting two metal pads. We are furthermore of opinion that if what is ordinarily termed an "electric current" is generated or occasioned by the attachment of the wire to two objects of a different temperature or different polarity, and if the curative effect of the device when applied to a patient is due to a slight electric force or energy thereby generated, then the device is wanting in patentable novelty. It seems most probable that, if it exerts any curative power, it is due to the cause last suggested. It is within the common knowledge of everybody that electric energy has long been used in the treatment of various diseases, and that when so employed it is conveyed from the source of generation to the patient by means of a wire, and is applied in various ways,— generally by bringing the end of the wire in contact with the affected part. There is nothing new in the idea of using electric energy to heal disease, although it may not be well enough proven to be accepted as an established scientific truth that electricity does effect cures. The inventor himself seems to have realized the truth of the foregoing observations, and we feel constrained to believe that he made the several assertions heretofore mentioned (that he did not employ dynamic currents, and that there was no flow of current) upon the assumption that if a current of electricity was developed by his device, or by his mode of applying it, its healing effect, if any, was most likely due to the slight electric current thus developed, and that in that event he would not be entitled to a patent. We have been forced to conclude, after a careful study of the specification, that the theory enunciated by the inventor, that most diseases are "due to a disturbance of the electrical equilibrium of the body," is a mere pretense; that is to say, a theory not entertained by the inventor in good faith, but put forward as an imaginary hypothesis merely for the purpose of obtaining a patent on a very simple contrivance, which was not patentable unless the claim was re-enforced by some such pretended discovery. The theory or discovery in question is certainly at war with at least one of the accepted truths of medical science of which we are entitled to take notice, namely, that many diseases are occasioned by germs or microbes that are taken into the system, either in the food which we eat, or the water which we drink, or in other ways, and whose operations in some instances have been observed and studied by the microscopist. We also conclude that the statement in the specification to which allusion has already been made, to the effect that the inventor does not by means of his device make use of "dynamic currents," but relies on some other mysterious and unexplained property of electricity to effect cures, is a statement which rests upon no substantial foundation, and was most likely inserted in the specification for the purpose of forestalling objections to the granting of a patent which would probably have been made if it had been conceded by the inventor that an electric current was generated and flowed along the connecting wire, to which the healing effect of the device might be attributable.

It may be conceded that one who discovers a new force, or a new capability of a known force, and who provides some practical means

for applying the new force or the new capability to a useful purpose, may obtain a patent, although the means which he provides are substantially old, or of such a kind that, when considered alone and without reference to the utilized force or capability, they would not be patentable. Rob. Pat. §§ 91, 92, 95, 959. We think, however, that a patent cannot be lawfully granted when, as in the present case, it appears that the claim preferred by the patentee that he has made a discovery of a new fact or principle in medical science, and of a new mode of operation of a known force whereby the discovery is utilized, rests upon no substantial foundation, and is at best an imaginary hypothesis, and was most likely put forward merely to obtain a patent on a device which he proposes to make and sell to the public for the treatment of disease. The granting of a patent under the circumstances last stated would give to the theories enunciated in the specification an appearance of authenticity, and tend to mislead and deceive the public if the theories are false.

For these reasons, we are of opinion that the patent in suit does not describe or cover a patentable device, and that it ought not to have been granted. It is accordingly ordered that the decree below be reversed, and that the cause be remanded, with directions to dismiss the bill of complaint.