FULLER v. BERGER et al.

(Circuit Court of Appeals, Seventh Circuit.   February 5, 1903.)

No. 847.

1. PATENTS—VALIDITY—UTILITY OF INVENTION.

An invention is useful within the meaning of the patent law if it is used, or is designed and adapted to be used, to accomplish a good result, though in fact it is oftener used, or is as well, or even better, adapted to be used, to accomplish a bad result.

2. SAME—BOGUS-COIN DETECTOR—IMMORAL USE.

The Mills patent, No. 613,844, for a bogus-coin detector for coin-operated vending machines, which is adapted to be used in connection with any coin-operated machine, is not void for lack of utility because it was assigned by the inventor to a manufacturer of gambling machines and has been used solely in connection with such machines.

3. SAME—RIGHT TO EQUITABLE RELIEF AGAINST INFRINGEMENT—MISUSE OF PATENTED DEVICE.

Neither the nonuse nor misuse of a patented device by the owner of the patent deprives him of the right to maintain a suit in equity to enjoin infringement.

4. SAME—SUIT FOR INFRINGEMENT—ISSUES.

The right of an inventor to make, use, and vend his device is not derived from the patent law, but is his natural right, the government's grant to the patentee and his assigns being merely of the right to exclude others from practicing the invention.   Hence in a suit to protect the right so granted by enjoining infringement an inquiry into the use which the owner of the patent makes of the invention is collateral and irrelevant, and cannot affect complainant's right to an injunction if infringement is shown.

Grosscup, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

Douglas Dyrenforth and John H. Lee, for appellant.

James H. Pierce, for appellees.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

BAKER, Circuit Judge.   Appellant, complainant below, unsuccessfully sought to enjoin appellees from infringing letters patent, No. 613,844, on a bogus-coin detector for coin-operated vending machines. The letters were granted November 8, 1898, to the Mills Novelty Company, assignee of the inventor.   While that company was the owner, the only practical use to which the detectors were put was to guard gambling machines, made and controlled by the company, from being operated by means of bogus coins.   On December 8, 1899, the company assigned the patent to appellant, and, as a part of the same transaction, took from him a license to make and use the device.   No one else used it by authority.   Appellees, without license, applied it to gambling machines of their make.   This suit was begun about a month after the assignment.   The circumstances surrounding the assignment and attending the conduct of this litigation warranted the trial court in finding that the equities of the case should be determined as if the Mills Novelty Company had been complainant.

The defenses are two:   That the patent is void for want of utility; and that, even if it is found not to be void, complainant has no

standing because he comes into court with unclean hands, in this, that his suit is brought to enable the Mills Novelty Company to prevent another gambler from interfering with its illegal enterprises.

In support of their first contention, appellees cite Device Co. v. Lloyd (C. C.) 40 Fed. 89, 5 L. R. A. 784; Novelty Co. v. Dworzek (C. C.) 80 Fed. 902; Schultze v. Holtz (C. C.) 82 Fed. 448; Rickard v. Du Bon, 43 C. C. A. 360, 103 Fed. 868; and Mahler v. Animarium Co., 49 C. C. A. 431, 111 Fed. 530. In the Rickard Case, involving a process for spotting tobacco leaves, and in the Mahler Case, concerning a cure-all device, the clear purpose and the sole use of the respective inventions were found to be to deceive and defraud the public. In the Schultze Case, the fact that the invention had been used solely for gambling and could not be put to any other use was held to avoid the patent. In the two other cases, applications for injunctions were denied on showings that the devices had been used only for gambling purposes. But the court, in each case, went further and held the device to be wanting in utility, saying: "The patent has been very recently issued, and it is possible that a useful application may yet be found for it; but, as the case now stands, the only use to which the invention has been put being for gambling purposes, I must hold that it is not a useful device within the meaning of the patent law." It may be doubted whether, in the latter holding, useableness (utility) and use (application) were not confounded; but, at all events, the courts in those cases came to the same end as the others, in deciding that the respective patents were not for useful devices within the meaning of the patent law.

With regard to the defense of no utility (available equally at law and in equity), we hold that the true inquiry is, Was the government improvident in making the grant? Does the opposing evidence, the grant itself being prima facie proof of utility, go to the extent of establishing not merely that the device has been used for pernicious purposes, but that it is incapable of serving any beneficial end? As the just criterion, we approve and adopt Mr. Walker's conclusion (section 82 [3d Ed.]), with the additions to his text which we note by parentheses:

"An important question, relevant to utility in this aspect, may hereafter arise and call for judicial decision. It is perhaps true, for example, that the invention of Colt's revolver was injurious to the morals, and injurious to the health, and injurious to the good order of society. That instrument of death may have been injurious to morals, in tending to tempt and to promote the gratification of private revenge. It may have been injurious to health, in that it is very liable to accidental discharge, and thereby to cause wounds, and even homicide. It may also have been injurious to good order, especially in the newer parts of the country, because it facilitates and increases private warfare among frontiersmen. On the other hand, the revolver, by furnishing a ready means of self-defense, may sometimes have promoted morals and health and good order. By what test, therefore, is utility to be determined in such cases? Is it to be done by balancing the good functions with the evil functions? Or is everthing useful within the meaning of the law, if it is used (or is designed and adapted to be used) to accomplish a good result, though in fact it is oftener used (or is as well or even better adapted to be used) to accomplish a bad one? Or is utility negatived by the mere fact that the thing in question is sometimes injurious to morals, or to health, or to good order? The third hypothesis cannot stand, be-

cause if it could, it would be fatal to patents for steam engines, dynamos, electric railroads, and indeed many of the noblest inventions of the nineteenth century. The first hypothesis cannot stand, because if it could, it would make the validity of the patents to depend on a question of fact to which it would often be impossible to give a reliable answer. The second hypothesis is the only one which is consistent with the reason of the case, and with the practical construction which the courts have given to the statutory requirement of utility."

We deem the additions to the second hypothesis necessary to a complete statement of the acceptable test, for, to continue with Colt's revolver as an example, if at the time of a suit for infringement the defendant should prove that the only uses to which "that instrument of death" had been put were vicious, the patent should not be held void for want of utility, if the court for itself should see, or be convinced by experts, that the instrument was susceptible of good uses, though in fact never put to such before the suit was begun. And, if utility is found, the cases seem to be uniform that courts will not set up a measure of utility which must be filled.

If the device here in question should be found insusceptible of other use than to guard gambling machines from being operated by means of bogus coins, we would be led to an outlook from which two interesting queries appear in view: (1) The statutes of Illinois, it is said, prohibit the use of coin-operated gambling machines, but not the manufacture or sale thereof. We are referred to statutes of other states, which, it is claimed, legitimate the use of such machines. Should a circuit court of the United States, sitting in Illinois, hold invalid a patent on such a machine and thereby destroy the monopoly of its manufacture and sale, because its use is forbidden in Illinois, though its manufacture and sale in Illinois and its use in certain other states are lawful? And (2) if the federal courts may properly hold patents on gambling machines void for lack of utility, because immoral, though countenanced by the legislation of particular states, is a device attached to such a machine likewise inimical to good morals, which prevents a gambler from being also a cheat?

But, returning to the main road, we have no difficulty, under the principles hereinabove asserted, in finding some degree of utility in this invention. In the specifications and claims the device is called a bogus-coin detector for coin-operated vending machines. The inventor's attention to the need of such a mechanism was not directed by the Mills Novelty Company or other maker of chance machines. A manufacturer of coin-operated banjo-playing instruments expressed a want for a bogus-coin detector. The invention in suit resulted. The parties failed to come to terms, not because the detector would not supply the need for which it was designed, but because the inventor asked more than the banjo manufacturer was willing to pay. Afterwards the application was assigned to the Mills Novelty Company, and by it the device was applied to gambling machines. There is no element of chance, however, in the operations of the detector. Its mechanism has no connection with that of the machine to which it is attached. The outlets of its coin chutes are placed in registration with the inlets of the chutes of the coin-operated machine. "The object of the invention," says the specification, "is to provide, as an attach-

ment for use with coin-operated vending-machines generally, a device through which the coin for paying the purchase price of the article to be delivered, and for rendering the machine operative to produce the delivery, must be passed in view and shall remain in view until the machine has been operated one or more times by another inserted coin or other such coins. * * * When the machine * * * is adapted to vend two or more articles, * * * the arrangement of the detector is such as to permit the coin or token last inserted previous to operating the machine to occupy a higher plane in its chute in the detector than the uppermost coin in the other detector chute or chutes, thereby to make it indisputably clear which of the array of coins or tokens was last inserted, so that the fraud, if any occurs, may be fastened with certainty upon the guilty person." The testimony of experts was not needed to show that the detector would perform its functions without regard to the character of the machine below its outlet. It is doubtless true that the detector would be more efficacious if an attendant were constantly beside it; but, without an attendant, the fact that the coin, instead of being dropped directly within the opaque case of the machine, remains in view during several subsequent operations, to reproach the cheat and expose him to the owner or other customers, would tend to act in some degree as a deterrent. And the facts that the inventor put the price beyond the willingness of good users to pay, that he assigned his invention to an evil user, and that appellant's suit is prosecuted with the ulterior aim of aiding the evil user, his sole licensee, go to the standing of appellant in equity, not to the legality of the grant. Colt's revolver is not in fault whether it comes to the hand of a policeman or a burglar.

The second defense amounts to this: The holder of a legal patent, who refuses to use or permit others to use his device for good purposes, and who prostitutes his invention in practice, will be given no relief in equity, though on the facts shown he could successfully maintain an action at law against the infringer. As counsel states it: "The court wholly disapproves of the complainant suitor, and declines to aid him, though the patent still retains its life. With that, the court's decree does not attempt to meddle. * * * There is ample chance ahead to efface the stain if the invention is really capable of worthy use and the patent owner seriously lends himself to accomplish the reform."

It seems clear that one who practices his invention in a noxious way only has no better standing in equity than one who declines to use the device for good purposes or to permit others to use it. And in Hoe v. Knap (C. C.) 27 Fed. 204, 212, there is a statement that "under a patent which gives a patentee a monopoly, he is bound to use the patent himself, or allow others to use it on reasonable terms." But this doctrine has been vigorously denied, and rightly, we think, in subsequent cases. Roller Mill Co. v. Coombs (C. C.) 39 Fed. 803; Campbell Printing Press & Mfg. Co. v. Manhattan R. Co. (C. C.) 49 Fed. 935; Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 25 C. C. A. 267, 77 Fed. 294, 47 U. S. App. 146. An extract from the last cited case, quoted in Bement v. National Harrow Co., 186 U. S. 70, 90, 22 Sup. Ct. 747, 46 L. Ed. 1058, will sufficiently indicate the general attitude:

. "If he see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device nor permit others to use it, he has but suppressed his own. That the grant is made upon the reasonable expectation that he will either put his invention to practical use, or permit others to avail themselves of it upon reasonable terms, is doubtless true. This expectation is based alone upon the supposition that the patentee's interest will induce him to use, or let others use, his invention. The public has retained no other security to enforce such expectations. A suppression can endure but for the life of the patent, and the disclosure he has made will enable all to enjoy the fruit of his genius. His title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself nor permit others to use it. The dictum found in Hoe v. Knap (C. C.) 27 Fed. 204, is not supported by reason or authority."

So nonuse is not a defense in equity. Is misuse? Equity is not concerned with the general morals of a complainant; the taint that is regarded must affect the particular rights asserted in his suit. Saddle Co. v. Troxel (C. C.) 98 Fed. 620; Folding Box Co. v. Robertson (C. C.) 99 Fed. 985, and cases therein collated. A complainant asserts the validity of his patent (a question of law on the facts), and infringement by defendant (a question of law on the facts), and asks an injunction on account of continued and threatened trespasses (an equitable remedy to make up for the inadequacy of the legal). Though the defendant may not be able to deny the validity of the patent or the fact of infringement, he may defeat the application for an injunction if he can show that the complainant, in his dealings with or conduct towards the defendant in relation to the subject-matter of the litigation, has acted unfairly or oppressively, or has misled the defendant with respect to the validity of the patent or the fact of infringement, or if the complainant, to make his case, is compelled to bring forward and count upon his own wrong. But if the defendant can do no more than show that the complainant has committed some legal or moral offense, which affects the defendant only as it does the public at large, the court must grant the equitable remedy and leave the punishment of the offender to other forums. In the present case, there have been no dealings between the parties. Nothing has been done to mislead appellees. And appellant, to make his case, simply brings forward his patent and proves the continued and threatened infringement. Against this, appellees establish that appellant has been misusing the patented device. But how does this concern appellees more or differently than it does others? Equity will aid the owner of a lawful patent if he puts the device to good uses, but will deny relief if he puts it to bad uses? The "reform," for the lack of, which appellees contend that appellant must be kept out of a court of equity for the present and until the reform is accomplished, is the reform of the man.

The conclusion follows from the foregoing premises that appellant is entitled to injunctive relief. But another consideration leads more strongly to the same result. The inventor's right to make, vend, and use his device does not come from the patent law; it is his natural right. The government's grant to the patentee and his assigns is the right to exclude others from practicing the invention. As Mr. Chief Justice Taney said in Bloomer v. McQuewan, 14 How. 539, 548,

14 L. Ed. 532: "The franchise which the patent grants consists altogether in the right to exclude every one from making, using, or vending the thing patented, without permission of the patentee. This is all he obtains by the patent." And on this basis rests the decision in Patterson v. Kentucky, 97 U. S. 501, 24 L. Ed. 1115, that a state law which prohibits the use of a certain article, which is patented, is not in derogation of the inventor's grant under the patent law. That is, the state law operates wholly upon the inventor's natural right to the use of his property, and not at all upon the franchise which the patent grants, which consists altogether in the right to exclude. His right to use his property is destroyed, but his right to exclude others stands unimpaired. Now, if the complainant in a patent suit is seeking merely to enforce his right to exclude, according to the terms of the government's grant, an inquiry into what use (or lack of use) the inventor is making of his natural right would seem to be clearly collateral and irrelevant. And if the right to exclude is the substance of the grant, it is a legal right. And in determining legal rights, equity follows the law. And if a legal right is established beyond every defense, legal or equitable, available to the defendant or to the court on its own motion, equity must grant appropriate relief if there is no adequate remedy at law. Injunction, it is evident, is the only means equal to enforcing the right to exclude.

It is sometimes said that the granting of an injunction is a matter of discretion. But courts of equity may not exercise a mere arbitrary discretion. They must act within and according to definite and certain principles. The conscience of equity is not the conscience of the particular chancellor. But if the conscience of equity were the conscience of the individual chancellors of this court, who, for example, may think that the public sentiment against the liquor traffic would be vindicated by denying the writ of injunction to an habitual ·drunkard whose property by repeated trespasses was being illegally confiscated, the appeal made in this case to deny the writ of injunction, on the ground that its issuance would aid crime and abet practices universally denounced, exhibits a misapprehension of the scope of this litigation. It is obvious that a denial of the writ would leave the defendants and all others perfectly free, so far as the power of this court is concerned, to follow the practices that are repugnant to the individual chancellors, while the maintenance of the complainant's right to exclude the defendants and all others would, to the extent that the patented device might otherwise be used by them to promote gambling, be a vindication of the public sentiment against gambling. It is equally obvious that, however the court may act upon complainant's asserted right to exclude, neither the grant nor the denial of the writ of injunction would operate upon complainant's practices or habits (which he did not acquire from the patent laws), and that the gambler, like the drunkard, is amenable to the municipal authorities alone for violations of the municipal law.

GROSSCUP, Circuit Judge (dissenting). Gambling and gambling ·devices are condemned by the laws of every state and territory, except perhaps New Mexico. Upon this it can be safely predicated that the

conscience of the people of the state in which this court sits; of the people of the three states that constitute this circuit; indeed, of the people of every state and territory, except a little territory bordering on Mexico, condemns the practice of gambling. Gambling and gambling devices are condemned, also, by the enactments of congress, in the statutes forbidding the use of the mails in aid of lotteries and other gambling purposes. Thus the national conscience is seen to be outspoken against the practice. Nothing could be conceived more conclusively showing a general conscience, and a general conception of policy. Unless a moral sense, thus widespread and unanimous, may be accepted as the conscience, not simply of the chancellor, but the judicial conscience, I am at a loss to know where to look for any authority for judicial conscience.

In the opinion from which I am compelled to dissent, it is assumed—and the record fully justifies the assumption—that the equities of the case under consideration should be determined as if the Mills Novelty Company were the complainant. The Mills Novelty Company has used the invention solely as an adjunct to a gambling machine. So far as the record discloses, its sole purpose for the future, is to use the invention in connection with gambling devices. The patentee shows no other purpose or practical use. The practical purpose of the writ of injunction asked for, therefore, is to aid them in their business of manufacturing and selling gambling machines; and such, and such alone, will be the practical effect of the writ when issued by this court.

In my judgment, on this state of facts, the writ should not be issued. But, because it is possible to apply the patent mechanically to a use not pernicious—though practically no such application is in mind—the majority of the court seem to think that the writ asked for cannot rightly be withheld. The majority are impressed with the cases that hold, that irrespective of whether the patentee actually uses his patent or not, the right to exclude others from its use is retained; and upon this postulate is based their judgment, that irrespective of the pernicious use of the patent by complainant, he may successfully invoke the aid of a court of equity to exclude others from its use. The majority hold that because the invention is mechanically capable of a moral use, there is created, at least technically, in the patentee, a valid property right,—a property right they feel themselves bound to protect, no matter what complainant is actually doing, or intends to do, with his invention.

I can assent to no such limitation upon the moral discretion of a court of equity. The bare existence of legal title does not leave the chancellor without discretion to issue, or withhold, his writ. Whence comes, it may be pertinently asked, the right to withhold the writ where complainant comes into court with a clear title, but without clean hands; or is guilty of laches; or bears in some other respect toward the party proceeded against an unconscionable attitude?

If a court may withhold the writ, though asked in aid of clear title, under one set of unconscionable circumstances, why may it not under another? Why is not the power to control its writ in the instances named applicable to any other instance where expediency, public policy, or substantial consideration of morals and conscience, are

equally commanding? The chancellor, in my judgment, is master of his own writ, and though the claimant hold a legal title, is under no compulsion of law to issue the writ, so long as sound consideration of public morals and conscience forbid.

The majority of the court is misled, I fear, by the seeming analogy of the cases that hold that a patentee, though declining to use his invention, may forbid its use by others. Non-use and pernicious use must not be confounded. The inventor who declines to put his patent into use occupies toward society an attitude entirely distinct from the inventor who is using his invention in a way that injuriously affects society. I am not sure that an inventor is not bound either to use his invention, or permit others to use it. The Supreme Court has not yet passed upon that question. But however that may be, the doctrine cannot be invoked in aid of a pernicious use. Non-use is not, in itself, pernicious, and inflicts no moral injury on society. At most, it is the withholding only of what society, but for the invention, would possibly never have had. But pernicious use is something different. It does not deny simply to society the present benefit of an invention— it visits upon society an affirmative moral harm. Pernicious use injures where non-use only withholds; wounds, where non-use only declines to help.

It may be doubted if complainant comes into equity with clean hands, even under the limitation that unclean hands is not a disability to be extended to any misconduct unconnected with the matter in litigation, or with anything with which the opposite party has no concern. A patent is not a private contract, nor a transaction between private individuals. It is a contract between the patentee and the public; and to every suit brought to enforce the patent, the public is beneficially a party. How a patentee has used his contract right, and how he intends to use it in the future, is a matter not unconnected with the public's interest in the litigation, and comes, therefore, to be a pertinent inquiry when an enforcement of his contract rights is asked for.

I would not, in the case under consideration, have the court, upon the facts presented, pass upon the validity or invalidity of the patent. The court should stand aloof from the whole transaction, not because the pernicious use is a defense that lies in appellee's mouth, but because it is a consideration the public may interpose, and because to issue the writ under such circumstances, would be to pollute the writ itself. The issuance of the writ, upon the case presented, will involve the court as an abettor in practices universally denounced and legislated against as harmful to the public morals. It will be an injunction in aid of crime. When the patentee comes into court with some conscionable use for his invention, or even with a non-use divorced from unconscionable use, it will be time to consider his claim for a writ; until that time, he should be shown the chancellor's back.

The decree is reversed, with the direction to enter a decree in appellant's favor for an injunction and an accounting.